Filed 5/18/21  P. v. Aguirre CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE, | C089878 |
| Plaintiff and Respondent, | (Super. Ct. No. SCCRCRF2017795) |
| v. | |
| ANDREW JAMES AGUIRRE, | |
| Defendant and Appellant. | |

A jury found defendant Andrew James Aguirre guilty of all counts set forth in a 26-count information charging him primarily with sex acts committed against minors. The trial court sentenced defendant to an aggregate term of 41 years four months plus 60 years to life.

On appeal, defendant asserts that the trial court erred in denying his motion to dismiss counts 11 through 20 because, in this procedurally convoluted prosecution, those charges had previously been dismissed three times and therefore they were barred by the

1

general rule in Penal Code section 1387 barring prosecution for the same felony offense that has been twice dismissed (statutory section references that follow are found in the Penal Code unless otherwise stated). Defendant further asserts the judgment must be reversed because the trial court's admission of evidence of prior sexual offenses under Evidence Code section 1108 deprived him of his due process and equal protection rights. Finally, relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant asserts the trial court violated his constitutional rights in imposing fines, fees, and assessments without first making an ability to pay determination.

We affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

The third consolidated information, the operative information, charged defendant with: lewd act on a child, N.C.C., under the age of 14 (§ 288, subd. (a); count 1); three counts of lewd act on a child, B.B., under the age of 14 (§ 288, subd. (a); counts 2-4); six counts of lewd act upon a child, L.M.D., under the age of 14 (§ 288, subd. (a); counts 5-10); five counts of sexual penetration by a foreign object against a child, L.M.D., under the age of 14 (§ 289, subd. (j); counts 11, 13, 15, 17, 19); five counts of oral copulation of a child, L.M.D., under the age of 14 (former § 288a, subd. (c)(1); counts 12, 14, 16, 18, 20); two counts of lewd act upon a child, L.M.D., who was 14 years old (§ 288, subd. (c)(1); counts 21-22); two counts of possession of matter depicting a minor engaging in sexual conduct (§ 311.11, subd. (a); counts 23-24); using a minor, "Confidential Victim," for sex acts (§ 311.4, subd. (c); count 25); and unauthorized invasion of privacy against Confidential Victim (§ 647, subd. (j)(3); count 26).

As to counts 1 through 4, the information alleged that, within the meaning of section 667.61, subdivisions (b) and (e), defendant committed an offense specified in subdivision (c) of that section against more than one victim within the meaning of subdivision (e)(4) of that section. As to counts 11 through 20, the information alleged

2

that, while the acts alleged occurred in North Carolina, the offenses fell within the jurisdiction of the court within the meaning of section 778a in that "it was commenced within the County of Siskiyou when the defendant groomed and molested the victim as a young child." Section 778a, subdivision (a), provides: "Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state, the person is punishable for that crime in this state in the same manner as if the crime had been committed entirely within this state."

As to count 24, the information alleged defendant possessed more than 600 images which constituted violations of section 311.11 and 10 or more images involving a prepubescent minor or a minor who had not attained 12 years of age within the meaning of subdivision (c)(1) of that section. As to count 26, the information alleged, in part, that "defendant groomed [and] photographed the Confidential Victim when she was under the age of 18."

The Prosecution Evidence

Dawn C. (Dawn) married defendant in 1997. Defendant joined the military the year before they were married. They lived in Washington for approximately a year after which defendant was reassigned to Germany. While they were living in Germany, the couple would come back to the United States to visit approximately once a year. They returned from Germany to the United States in or about August 2001. While defendant trained in Georgia, Dawn and the couple's son lived in Yreka. After his training in Georgia, defendant was stationed at Fort Bragg, North Carolina, where Dawn and the couple's son joined him. In January 2003, the couple had another son and in 2005 they had a daughter.

As discussed in greater detail *post*, in North Carolina in 2005, A.M., a young girl from across the street, made an allegation against defendant after coming over to defendant's house to watch a movie. At some point, in 2006 or 2007, after a second child

3

made an allegation against defendant, the military investigated. There was a court martial. According to Dawn, defendant was "held responsible for some of that," but that result was ultimately overturned on appeal.

Dawn testified that, during the marriage, she had a prescription for Ambien for insomnia. When she slept, defendant would take photographs of her of a sexual nature and show them to her later. She testified that this happened too many times to count. She also testified defendant committed spousal rape when she was using Ambien.

Dawn left defendant in 2012 and the couple divorced in 2013.

1.    Victim L.M.D. (Counts 5-22)

L.M.D. was the daughter of Dawn's half sister. She was born in July 1988.

L.M.D. recalled an incident that occurred when she was 10 years old. She was at a family graduation party in Yreka watching a movie. Defendant came in and sat next to her on the couch. They were alone in the room. Defendant placed his fingers between L.M.D.'s legs and moved his fingers around, up and down and in a circular motion on the outside of her vagina underneath her clothes. She was scared and shocked, and she did not know what to do. Defendant eventually stopped. He told her not to say anything or she would get in trouble.

After they moved away, defendant and Dawn would visit California approximately once a year. L.M.D. testified that sexual incidents occurred on those visits. According to L.M.D., defendant would enter her bedroom and insert his fingers in her vagina.

At some point after Dawn and defendant returned from Germany, they obtained guardianship of L.M.D. L.M.D. joined Dawn, defendant, and the couple's son in North Carolina in June 2002, when she was 13 years old.

L.M.D. acknowledged that, when she previously spoke to law enforcement, she said she was younger when she went to North Carolina, because she "got [her] times

4

mixed up of when [she] went to North Carolina. [She] thought [she] was a lot younger than what [she] was." This is discussed in detail in part I of the Discussion, *post*.

L.M.D. remembered going to church with defendant and Dawn while in North Carolina. Defendant would point out "what little girls he thought were hot." L.M.D. estimated the ages of these girls to be nine to 11 years old. She also testified defendant always told her how cute he thought she was, and that he thought she had a nice body.

Days after L.M.D. arrived in North Carolina, defendant began to touch her again. On the first occasion, she was sleeping in her room when defendant came in, kissed her, and stuck his hands down her pants. L.M.D. testified: defendant "would come into my bedroom before he went to work because he would leave like 5:00 or 5:30 in the morning. He would come and wake me up and kiss me and put his hands between my legs again through my underwear, touch me there. And then once in a while I would suck his penis." She testified defendant would put his fingers inside her vagina. According to L.M.D., "[i]t was like couple days a week for each thing." Defendant inserted his fingers in her vagina approximately four or five days a week, and had her orally copulate him approximately "every two days." This went on each week for as long as she was in North Carolina. She stayed in North Carolina approximately three weeks to a month and left before her 14th birthday at the end of July. These incidents continued "up until the day [she] left."

L.M.D. saw defendant again at her grandmother's house approximately six months after she left North Carolina. Defendant asked her if she wanted to have intercourse and she responded that she did not know. Defendant lay on the bed and "inserted it." L.M.D. testified: "I remember being in my grandparent's room and I was just wearing a shirt and then we had intercourse in my grandparents' bed."

L.M.D. obtained her driving permit when she was 15 and defendant would take her driving. He would put his hand on her crotch, sometimes on the inside of her pants, sometimes on the outside. Defendant took her driving "pretty much on a daily basis" or

5

two to three days a week and he touched her vaginal area, although not every time they went driving. He touched her at least once a week over a period of four to six months.

Even after their last sexual contact, defendant "[w]ould contact [L.M.D.] on . . . Yahoo Messenger asking about sexual intercourse again or he would text [her] cell phone and ask for nude pictures."

According to Dawn, defendant was "always on the computer." She became suspicious. Upon investigating Yahoo Messenger messages on the computer, Dawn "discovered inappropriate conversations between [L.M.D.] and the defendant."

L.M.D. testified that, at one point, defendant was trying to get his military benefits reinstated following the court martial. Dawn's sister contacted L.M.D. and said she would give L.M.D. $100 if she would write a letter saying nothing ever happened between defendant and L.M.D. L.M.D., who, for a time, had turned to drugs to "numb a lot of the pain," testified that, "at that point in my life I was really low, I could use a hundred dollars." So she wrote and sent the letter.

2. Victim A.M. (Evidence Code Section 1108 Witness)

A.M.'s father was in the military and for some time they lived at Fort Bragg, North Carolina. Defendant's family lived across the street. One day, when A.M. was about six years old, she went over to defendant's house to watch a movie. Defendant sat next to her on the couch and put his hands on her. He placed his hands on her upper leg and then put his hand up the pantleg of her shorts. Defendant touched A.M. on her vagina under her shorts but over her underwear. A.M. tried to move away but defendant persisted.

When A.M. was 10, she testified in defendant's court martial. She was frightened when she testified and she could not bring herself to identify defendant as the person who abused her. She believed defendant was found not guilty at the court martial. At this

6

trial, A.M. testified defendant was the person who abused her, and she had no doubt about that.

3.      Victim <u>N.C.C.</u> (Count <u>1</u>)

Dawn's brother Michael and his wife Adrienne had a daughter, N.C.C. She used to spend time with her cousin, defendant and Dawn's daughter, and sometimes would spend the night at their house. One night, in the summer of 2012, when she was eight years old, N.C.C. was sleeping over. She and her cousin shared the same bed. At one point, N.C.C. woke up to find defendant sitting next to the bed. He had his hand in her underwear and was touching her vagina under her clothing. N.C.C. rolled away but defendant "kept continuing." Every time she tried to move away, defendant would stop, but when she stopped moving, he would resume. Finally, N.C.C. said, "stop" very quietly and defendant stopped.

N.C.C. initially did not tell anyone what happened, and then defendant moved to another state. However, after a while, defendant moved back and N.C.C. "figured it was time I should tell everyone what happened." She could not figure out how to tell people. Ultimately, she wrote a letter and gave it to her mother. After reading the letter, Adrienne called Dawn and read the letter to her. Dawn called the police. N.C.C. read the letter to the jury at trial.

Sheriff's Deputy Mireya Cabron met with Dawn and N.C.C., and took the letter. Dawn informed Cabron about another relative who claimed defendant had sexually abused her. Cabron then went with Dawn to L.M.D.'s house. L.M.D. told Cabron defendant had sexual intercourse with her and, in North Carolina, had her perform oral sex on him.

4.      Victim <u>B.B.</u> (Counts <u>2-4</u>)

B.B. was 11 years old at trial and was born in July 2007. Her mother was Jacki (Jacqueline) and her step father was Mikey (Michael), defendant's brother. Defendant

7

stayed with them in Yreka. B.B. testified that, on one occasion, she got in trouble and was supposed to go to her room. She got bored and went into the room where defendant was staying at the time. B.B. asked if she could play on his phone. While B.B. played on defendant's phone, he called her hot and told her not to tell anyone, and then he tried to touch B.B.'s private parts, which she also referred to at trial as "the pee spot." B.B. backed up before defendant could touch her. Eventually, however, defendant did touch B.B.'s private part.

On another occasion, B.B. was in the living room. Defendant was sitting on the couch and B.B. was doing somersaults on the couch. Defendant put his hand up "[s]o he was like trying to touch [her] privates." At one point, he did touch B.B.'s privates with his arm. She testified that he probably touched her private part twice while they were on the couch.

Michael acknowledged that, at some point, defendant offered to show him photographs of Dawn naked.

Jacqueline observed defendant at his apartment having "candy parties" where he would have lots of kids over, mostly girls. She also saw him at Walmart buying electronics for three girls whom Jacqueline estimated to be between 10 years old and in the eighth grade.

5. Victim B.W.

B.W. was born in July 1999. When she was 14, defendant sent her a Facebook message stating that she went to school with his kids. They began messaging over Facebook and then communicated by phone calls and text messages. Then they started to spend time together. Defendant would take B.W. to and from school and help her with her homework. He also bought her things she could not afford like a phone and fast food.

Over time, the messages defendant sent to B.W. became sexual in nature. Defendant sent her pictures, including a picture of a girl without clothes and said he

wanted to have sex with her. B.W. sent 20 or more pictures to defendant, including pictures of herself in underwear and completely naked. She was between 14 and 16 years old at the time.

At some point, B.W. discovered defendant was involved in a relationship with an underaged girl she knew, A.D., which both defendant and A.D. confirmed.

6. Victim A.D. (Evidence Code Section 1108 Witness)

A.D. was 17 years old at trial. B.W. introduced A.D. to defendant when A.D. was 14 years old. A.D.'s mother was hospitalized, and the first time she met defendant, he gave her a ride, and they started hanging out together. They would spend time together at parks, at the library, at A.D.'s house, and defendant would take A.D. to school.

A sexual dimension to the relationship began shortly after A.D. and defendant met. On the first day of school, defendant offered to give A.D. a ride. He picked her up to take her to school, but they went to a park first. When they got to the park, defendant kissed A.D.

On another occasion, A.D. was with defendant in his car and he touched her vaginal area. He first touched her over her clothes, and then touched her under her clothing. He touched her both on the outside and inside of her vagina. She recalled that this sort of touching occurred at four to six places including a hotel and at her mother's house.

On other occasions, defendant asked A.D. to touch his "private part," and she did so. Asked how many times this occurred, A.D. responded, "[t]oo many," and more than 20 times.

A.D. testified that defendant had intercourse with her "[m]any" times.

A.D. recalled a time when she was staying in a hotel with defendant and law enforcement came to the room. They asked her questions about whether anything sexual

9

was happening. A.D. told law enforcement, on more than one occasion, there was nothing sexual going on between her and defendant.

Yreka Police Officer Scott Daugherty testified that, on October 9, 2016, he was dispatched to a hotel room in Yreka. He knocked on the hotel room door and defendant answered. Defendant claimed he was there alone. Daugherty told defendant there was a report of a female juvenile with him against her will. Daugherty asked for consent to search the room, but defendant refused. Daugherty told defendant he would simply wait and see who came out of the hotel room. Defendant then stood back and A.D. came to the door. Daugherty believed A.D. was 14 or 15 at the time. A.D. told Daugherty nothing sexual was going on between her and defendant. Daugherty testified this "was not the first time that we've talked about this with" her.

After defendant's arrest, A.D. had his car keys. She collected defendant's possessions from his car, including a laptop and hard drives. A.D.'s godmother found the electronics and turned them in to the police.

7. Additional Testimony Concerning the Investigation and Defendant's Electronics

Doug Dahmen, an Investigator with the Siskiyou County District Attorney's office, testified about his review of a report concerning defendant's hard drives. He found some personal information as well as photos, videos, and documents. A number of the images and videos "had a TOR Browser attached to them," which allows one to access the "dark web." Dahmen testified that more than 264,000 items had the TOR signature.

Detective Matthew Thoma examined defendant's laptop and hard drives. On both the laptop and an external hard drive, Thoma found a large number of images of what he believed to be child pornography. The laptop included TOR clients used to access the dark web.

District Attorney Investigator Yves Pike reviewed a flash drive prepared by Thoma containing material extracted from defendant's electronic devices. Pike reviewed text messages and photos exchanged between defendant and B.W. Pike also found a number of photographs of another girl, J.F., "that appeared to have been taken surreptitiously of [her] in states of partial undress and/or asleep by" defendant.

Pike testified that, between the laptop and hard drive, there were approximately 385,000 still images and 7,800 videos of child pornography. Pike testified: "We found images of a pornographic nature ranging from a month or two old up to adults." Pike also described two guides he found on how to safely have sex with young girls.

Defense Evidence

Defendant's daughter testified she did not recall ever being woken up by her father coming into the room when N.C.C. was sleeping over.

Defendant denied sexually abusing the alleged victims and soliciting naked photos from B.W. He also denied raping Dawn. Defendant also denied ever accessing the dark web or downloading child pornography.

Defendant acknowledged having a sexual relationship with J.F., but he believed she was 18 at the time. He acknowledged taking photos of her, although he testified she had been aware he was doing so.

Defendant acknowledged that, at one point, A.D. was in a hotel room with him. She came to the room and told him she had been in a fight with her mother because there was nothing to eat at her house, and her mother kicked her out. Defendant did not let A.D. stay the night, but she returned the following morning. Defendant got her breakfast, and she ate it in the hotel room. He recalled law enforcement coming to his room and he denied telling them he was alone. He clarified that law enforcement said there was someone being held against her will and he responded that there was no one there against their will. He denied engaging in any sexual activity with A.D.

11

Defendant testified that six charges were asserted against him at the court martial. The results of the court martial were: "Not guilty on all counts except for one, there was a lesser included account of assault and battery; and the jury convicted [defendant] . . . and [he] was sentenced for that one lesser included assault and battery." However, that conviction was overturned on appeal.

Defendant testified that all of the alleged victims who had accused him had lied.

<u>Verdict</u> <u>and</u> <u>Sentence</u>

The jury found defendant guilty on all counts. The jury also found true all enhancement allegations with the exception of the allegation attached to count 26 that the victim was a minor at the time of the offense and defendant knew the victim was a minor.

The trial court sentenced defendant to an aggregate term of 41 years four months plus 60 years to life calculated as follows: 15 years to life consecutive on counts 1 through 4, the upper term of eight years on count 5, the principal term, consecutive two-year terms, one third the midterm, on counts 6 through 20, consecutive eight-month terms, one third the midterm, on counts 21 through 25, and a concurrent term of 180 days on count 26.

DISCUSSION

I

*Section 1387 and the Two Dismissal Rule*

Section 1387, subdivision (a), provides, in part and with four enumerated exceptions not relevant here: "An order terminating an action pursuant to this chapter, or Section 859b, 861, 871, or 995, is a bar to any other prosecution for the same offense if it is a felony . . . and the action has been previously terminated pursuant to this chapter, or Section 859b, 861, 871, or 995. . . ." "This commonly is called in felony cases the two dismissal rule." (*People v. Mason* (2006) 140 Cal.App.4th 1190, 1195.)

12

Defendant's contentions, summarized *post*, relate solely to counts 11 through 20 of the third consolidated information. These are the counts alleging conduct committed against L.M.D. in North Carolina in 2002. To analyze defendant's contentions, we must trace the evolution of charges alleging conduct against L.M.D. in North Carolina. We limit our discussion to only those counts relevant to this analysis.

Case No. SCCR-CRF-2017-368

The prosecution filed a felony complaint in case No. SCCR-CRF-2017-368, accusing defendant of two counts of lewd act on a child under 14 (§ 288, subd. (a) and one count of lewd act on a child aged 14 years old (§ 288, subd. (c)(1)). The victims were identified as Jane Does 1 through 3. The acts were alleged to have occurred in or about May 2012 (count 1), March 16, 2017 (count 2), and September 2016 (count 3). There was no reference to North Carolina or acts occurring there.

The prosecution moved to amend the complaint, among other things, to add counts 4 and 5, violations of sections 288.5, subdivision (a), and 288 subdivision (c)(1). The prosecution stated, "the victim of the newly amended counts 4 and 5 was mentioned in the discovery provided to the defendant. However, it appeared as though her victimization took place outside the jurisdiction of this Court. Further investigation determined that jurisdiction here is proper and the amendment is appropriate."

We note that section 778a, subdivision (a), provides: "Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state, the person is punishable for that crime in this state in the same manner as if the crime had been committed entirely within this state."

The prosecution filed an amended felony complaint on April 11, 2017, charging defendant, insofar as relevant here, with continuous sexual abuse of L.M.D, a child under the age of 14 (§ 288.5, subd. (a); count 4), alleging defendant engaged in three or more

13

lewd and lascivious acts as defined in section 288 on or about "June to August 1996 and 1997." The amended felony complaint alleged: "[t]hese crimes took place in the State of North Carolina but are within the jurisdiction of the County of Siskiyou pursuant to . . . section 778a."

Also on April 11, 2017, the trial court conducted a preliminary hearing. Deputy Cabron testified that L.M.D., who was born in July 1988, told her that when she was 14, "she had gone to North Carolina to stay with [defendant] and Dawn and [defendant] had touched her inappropriately multiple times and asked her to suck his dick every day before he would go to work." According to Cabron, L.M.D. indicated she had stayed in North Carolina, and this conduct continued, for approximately three months. Cabron testified that, in a follow-up interview with L.M.D., she clarified that the incidents in North Carolina occurred when she was nine or 10 years old, in 1996 or 1997. L.M.D. told Cabron that, during this time, "defendant would come into her bedroom in the morning and take her pants off and insert one or two of his fingers into her vagina . . . ." L.M.D. told Cabron defendant "would also ask her to suck his dick."

Following the preliminary hearing, the trial court concluded: "The Court is . . . persuaded that there is adequate reason to believe that there is a violation of . . . section 288.5(a) as a felony as alleged in count four and that although the acts occurred in North Carolina that the nature of the acts are such that they are within the jurisdiction of Siskiyou County pursuant to" section 778a. The court held defendant to answer on count 4.

The prosecution filed an information on April 24, 2017. The information charged defendant with continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a); count 3) occurring "[o]n or about June to August 1996 and 1997." The information echoed the complaint's jurisdictional basis under section 778a.

On June 20, 2017, the prosecution announced it was ready to proceed. A discussion was then held off the record. Thereafter, when the court asked if the

14

prosecution was ready to proceed, the prosecutor responded: "The People are ready to proceed, however, I understand that there have been arrangements made in this trial. The People will honor that. And that arrangement involves at this point the People to dismiss the case subject to refiling, which I'm prepared to do right now." The court stated it was dismissing the information, to which defense counsel offered a cursory speedy trial objection.

The Attorney General asserts that a subsequent filing "shed some light" on the nature of these "arrangements." The passage on which the Attorney General relies states: "The People moved to continue the trial at the victim's request . . . . When this motion was denied the trial was trailed behind another felony trial being conducted by [defendant's] attorney. The People agreed to trail this trail [*sic*] with the understanding, and upon the prosecutor's representation, that the case would be dismissed and refiled if the other trial went forward and eclipsed the defendant's time waiver period. The People agreed to this because the Bureau of Investigation was still conducting follow-up investigation."

### Case No. SCCR-CRF-2017-795

On the same day, June 20, 2017, the prosecution filed a felony complaint in case No. SCCR-CRF-2017-795. In count 3, the felony complaint charged defendant with continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a); count 3) occurring "[o]n or about June to August 1996 and 1997." The information alleged that these crimes took place in North Carolina but jurisdiction was proper pursuant to section 778a.

Deputy Cabron again testified at the July 7, 2017, preliminary hearing that L.M.D., born in July 1988, stayed with defendant and Dawn in North Carolina for a summer. L.M.D. reported this was when she was 14 years old. Cabron testified that L.M.D. reported that, while she was staying at defendant's house in North Carolina, he

15

would come into her room and ask her to " '[s]uck his dick,' " and she complied. Defendant would also take her pants off and insert his fingers in her vagina. L.M.D. reported these incidents occurred at least 10 times. As she had at the prior preliminary hearing, Cabron testified that, in a subsequent conversation, L.M.D. stated that the incidents in North Carolina, occurring in 1996 or 1997, occurred when she was younger than previously indicated.

Investigator Pike subsequently testified at the preliminary hearing that, in an interview on June 20, 2017, L.M.D. was uncertain about the exact year the molestation in North Carolina occurred, but "it was during the time that Dawn . . . and [defendant] had custody of her, legal guardianship." Pike then verified defendant and Dawn obtained guardianship of L.M.D. on February 13, 2002.

The prosecutor noted that there had been quite a bit of discussion about the time frame and that, given L.M.D.'s age and the length of time that has passed since the events, "it's understandable the dates would be a little unclear to her." The prosecutor stated: "I don't have an explanation of why she was saying 1996 to '97, we did send our investigators back to try to establish that. Established that in 2002 guardianship was given to the defendant, that she went there at that time or shortly thereafter, and was 13 until June [*sic*] 27, 2002, when she turned 14." Thus, the prosecutor stated, "I think Count 3 should be amended to say June to July 27th, or 26th -- to July 26th, 2002. And that would accurately reflect the testimony."

Defense counsel noted that section 288.5, subdivision (a), "says that the duration of the events needs to be not less than three months, so the amendment itself vaguely doomed the charge because the time frame is less than three months." Defense counsel also objected to count 3 on section 778a grounds.

The prosecutor replied, "[h]e is obviously right about Count 3 in terms of the three-month time period. So what we will do is we will be filing an Information with all of the 288s from July of that year laid out," thus indicating the prosecution's intention to

16

abandon the section 288.5 continuous sexual abuse theory in favor of discrete section 288 allegations.

The trial court found probable cause as to all counts of the felony complaint except count 3. The court concluded: "Count 3 has not been adequately proven based on the time frame. The fact that there was no evidence that three or more months passed between the first and last acts . . . ."

On July 21, 2017, the prosecution filed a 19-count information. Counts 5 through 16 pertained to L.M.D. With regard to the incidents occurring in North Carolina, the information alleged five counts of sexual penetration by a foreign object (§ 289, subd. (j); counts 7, 9, 11, 13, 15) and five counts of oral copulation of a person under 14 (former § 288a, subd. (c)(1); counts 8, 10, 12, 14, 16). Each pair of counts, consisting of one sexual penetration count and one oral copulation count, alleged the incidents occurred during a specified week between June 16, 2002, and July 26, 2002. The information alleged section 778a as the basis for jurisdiction.

Defendant moved pursuant to section 995 to set aside the information. With regard to the counts charging conduct in North Carolina, defendant's motion was premised on jurisdiction and section 778a. Defendant asserted: "[n]o evidence presented at the preliminary hearing or in discovery establishes contact with [L.M.D.] before she moved to North Carolina. Because there is no evidence of some preparatory act . . . in California, the general rule prohibiting prosecution of conduct that occurred outside its borders deprives this court of jurisdiction over the North Carolina conduct reflected in counts 7-15." It would appear defendant unintentionally omitted count 16.

The trial court granted defendant's section 995 motion as to counts 5 through 16. As to counts 7 to 16, the court concluded there was not "any basis of fact of the preliminary events that would be necessary to be established having taken place in Siskiyou County so that the North Carolina events could be charged based on the record from the preliminary hearing."

17

<u>Case No. SCCR-CRF-2017-1271</u>

The prosecutor next filed a felony complaint in case No. SCCR-CRF-2017-1271 which incorporated the counts stricken from case No. SCCR-CRF-2017-795. Each of the 12 counts in the felony complaint pertained to L.M.D. Counts 3 through 12 pertained to conduct occurring in North Carolina between June 16, 2002, and July 26, 2002. They essentially duplicated counts 7 through 16 of the information in case No. SCCR-CRF-2017-795. Following the preliminary hearing testimony of Investigator Pike, the trial court held defendant to answer on all 12 counts.

Subsequently, the prosecution filed a 16-count information. Counts 7 through 16 corresponded to the counts in the felony complaint concerning conduct against L.M.D. in North Carolina.

<u>Defendant's Motion to Dismiss Pursuant to Section 1387</u>

Defendant filed a motion pursuant to section 1387 to dismiss "the above entitled matter because the charges have been twice dismissed, and there is no exception which allows the prosecution to file the charges a third time, or otherwise continue with its prosecution of said charges." Defendant asserted the "charges in question have already been dismissed twice, once by the prosecution on June 20, 2017, and then via . . . Section 995, on August 31, 2017."

The prosecution opposed the motion, asserting that counts 7 through 16 had not been dismissed twice. The prosecutor asserted, "Count 3 in docket 17-368 alleged a violation of . . . § 288.5(a) with L.M.D. as the victim, having taken place in North Carolina between June 1996 and August 1997. Counts 7 through 16 are acts of sexual abuse against victim L.M.D. in North Carolina in June and July 2002. Such allegations were never made in docket 17-368. They first made the appearance in counts 7-16 of docket 17-795 and are now charged in docket 17-1271." The prosecution further asserted that even if the charges had been twice dismissed, the second dismissal did not fall under section 1387. The prosecutor asserted: "The charges contained in counts 7 through 16 in

18

docket 17-1271 are based upon evidence underlying previous charges that were dismissed as counts 7-16 in docket 17-795 by the Court for <u>lack of jurisdiction</u>. This dismissal does not qualify as an 'interests of justice' dismissal pursuant to section 1385. Therefore it is not a dismissal 'as defined in Section 1387' as required by that section and is not subject to the two dismissal rule." Finally, the prosecutor asserted that refiling of these counts was permissible under the doctrine of excusable neglect. (See § 1387.1.)

In a supplemental filing, defendant asserted the June 20, 2017, dismissal of the continuous sexual abuse charges in case No. SCCR-CRF-2017-368 on the prosecution's motion constituted the first dismissal. The second dismissal occurred in case No. SCCR-CRF-2017-795. "At the preliminary hearing, which was held for 17-795, on July 7, 2017, count three," continuous sexual abuse of L.M.D. "was again dismissed when the magistrate did NOT hold the defendant to answer on that count." Defendant asserted: "The result of the prosecution's dismissal of 17-368 (including count 3—continuous sexual abuse), when *combined* with the magistrate's decision NOT to hold to answer on the same allegations in the subsequent filing of 17-795 (including count 3—continuous sexual abuse), is that a prosecution of that charge/allegation is barred. The ultimate result is that the corresponding allegations in our current complaint, case number 17-1721, are barred and must be dismissed."

At oral argument before the trial court, the prosecutor argued: "This isn't nearly as complicated as is being suggested. [Defense counsel] was present for the last preliminary hearing that led to this, and at that preliminary hearing supervising investigator Pike testified that these all came from the subsequent interviews. These have nothing to do with that original 288.5" Further, the prosecution argued that dismissal on the section 995 motion was jurisdictional and thus did not effect a dismissal within the meaning of section 1387.

The trial court denied defendant's motion to dismiss.

On January 9, 2018, the trial court granted the prosecution motion to consolidate case No. SCCR-CRF-2017-795 with case No. SCCR-CRF-2017-1271, consolidating under the former. On January 16, 2018, the prosecution filed a 23-count consolidated information under case No. SCCR-CRF-2017-795.

Case No. SCCR-CRF-2018-560

On April 17, 2018, the prosecution filed a felony complaint in case No. SCCR-CRF-2018-560, charging defendant with one count of possession of matter depicting a minor engaging in sexual conduct. (§ 311.11, subd. (a).) The trial court granted the prosecution's motion to consolidate this count with case No. SCCR-CRF-2017-795. On April 11, 2019, the prosecution filed the operative 26-count third consolidated information under case No. SCCR-CRF-2017-795.

Defendant's Contentions

Defendant asserts that counts 11 through 20 have been dismissed three times, they are thus procedurally barred pursuant to section 1387, and the trial court erred in denying his motion to dismiss those counts.

According to defendant, the first dismissal occurred on June 20, 2017, in case No. SCCR-CRF-2017-368, when, on the prosecution's request, count 3 of the information, charging defendant with the continuous sexual abuse of L.M.D. occurring "[o]n or about June to August 1996 and 1997" in North Carolina in violation of section 288.5 was dismissed.

Defendant asserts the second dismissal occurred in case No. SCCR-CRF-2017-795, when the trial court found probable cause lacking as to count 3 of the felony information, charging one violation of section 288.5. The court concluded: "Count 3 has not been adequately proven based on the time frame. The fact that there was no evidence that three or more months passed between the first and last acts . . . ."

The third dismissal, by defendant's count, occurred when the trial court granted that branch of defendant's motion which was to dismiss counts 5 through 16 of the information pursuant to section 995, all pertaining to L.M.D. as the victim. Counts 7 through 16 alleged conduct occurring in North Carolina. Section 778a provided the basis for jurisdiction. The alleged acts occurred between June 16, 2002, and July 26, 2002. In granting defendant's motion, the trial court concluded there was not "any basis of fact of the preliminary events that would be necessary to be established having taken place in Siskiyou County so that the North Carolina events could be charged based on the record from the preliminary hearing."

Analysis

The charge dismissed on June 20, 2017, on the prosecution's request, in case No. SCCR-CRF-2017-368, was an alleged violation of section 288.5, subdivision (a), based on continuous sexual abuse of L.M.D. in North Carolina. This continuous sexual abuse was alleged to have occurred "[o]n or about June to August 1996 and 1997." Defendant asserts this constituted the first dismissal for purposes of section 1387. The Attorney General counters that this count "implicated a materially different timeframe" than the subsequently filed counts, including the current counts, alleging conduct occurring in June and July of 2002.

The operative charges at issue here consist of five counts of sexual penetration by a foreign object against a child, L.M.D., under the age of 14 (§ 289, subd. (j); counts 11, 13, 15, 17, 19), and five counts of oral copulation of a child, L.M.D., under the age of 14 (former § 288a, subd. (c)(1); counts 12, 14, 16, 18, 20). These acts allegedly occurred in North Carolina between June 16, 2002, and July 27, 2002. These statutory violations on these 2002 dates were first specifically alleged as such in the July 21, 2017, information in case No. SCCR-CRF-2017-795.

21

Thus, we must consider whether the section 288.5 count allegedly occurring in 1996/1997 as charged in case No. SCCR-CRF-2017-368, on the one hand, and the violations of section 289 and former section 288a in 2002, on the other, are the "same offense[s]" as that term is used in section 1387.

"What the Legislature means by 'same offense' " in section 1387 "is far from clear." (*People v. Juarez* (2016) 62 Cal.4th 1164, 1169 (*Juarez*).) Section 1387 does not "automatically 'apply to all charges arising from the *same conduct or behavior* of the defendant.' " (*Juarez*, at p. 1172, quoting *People v. Traylor* (2009) 46 Cal.4th 1205, 1213, fn. 6.) Our high court in *Juarez* stated that its prior cases interpreting section 1387 "make clear that in interpreting what is and what is not the 'same offense' under section 1387, courts must consider the statute's purposes." (*Juarez*, at p. 1173.) "Section 1387 implements a series of related public policies. It curtails prosecutorial harassment by placing limits on the number of times charges may be refiled. [Citations.] The statute also reduces the possibility that prosecutors might use the power to dismiss and refile to forum shop. [Citations.] Finally, the statute prevents the evasion of speedy trial rights through the repeated dismissal and refiling of the same charges." (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1018 (*Burris*); accord, *Juarez*, at p. 1170.)

In *Juarez*, our high court considered whether attempted murder and conspiracy to commit murder were the same offense for purposes of section 1387. (*Juarez, supra*, 62 Cal.4th at p. 1169.) Initially, our high court noted that whether the charges at issue contained identical elements was "only part of the question." (*Id*. at p. 1170.) However, the court also stated that, "when the later offense contains the same elements as the twice-dismissed charge, it is the same offense." (*Id*. at p. 1173.) Our high court subsequently stated: "examining the statutory elements is not the only method to determine whether one crime is included in another. In many circumstances where we are seeking to identify a lesser and necessarily included relationship, 'we apply either the elements test or the accusatory pleading test. "Under the elements test, if the statutory elements of the

22

greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." ' " (*Id*. at p. 1174.)

Our high court noted that, in *Dunn v. Superior Court* (1984) 159 Cal.App.3d 1110 (*Dunn*), the Court of Appeal applied the accusatory pleading test in the context of section 1387. (*Juarez, supra*, 62 Cal.4th at p. 1174.) In *Dunn*, the Court of Appeal stated that, "[a]lthough every robbery does not include an auto theft, the concept of necessarily included offenses permits reference to the facts in the accusatory pleading." (*Dunn*, at p. 1118.) The court concluded that "the essence of the auto theft and robbery is the same since the robbery was specifically alleged to be the taking of the same automobile." (*Dunn*. at pp. 1118-1119.) Following its discussion of *Dunn*, our high court in *Juarez* stated, "respecting multiple felony offenses . . . if, as pleaded, either charge is necessarily included in the other charge, the new charge is the same offense under section 1387." (*Juarez*, at p. 1174.) Thus, in *Juarez*, our high court concluded: "Applying this test, the conspiracy to commit murder charges, as pleaded, are the same offenses as the previously dismissed attempted murder charges. The element of attempted murder that is missing from conspiracy to commit murder is a direct but ineffectual act toward accomplishing the intended killing. The felony complaint in this case alleged several overt acts regarding each conspiracy charge, including actually shooting the intended victim of each alleged conspiracy. Alleging an actual shooting of the intended victim necessarily also alleges a direct act toward accomplishing the intended killing. Accordingly, as pleaded, the conspiracy charges include all of the elements of the previous attempted murder charges, thus making them the same offenses as the previous charges." (*Ibid*.)

Defendant maintains that the later charged counts under former section 288a (now § 287) and section 289 are lesser included offenses of the earlier-charged section 288.5. Subdivision (a) of section 288.5 requires the prosecution to prove that a defendant "who

23

either resides in the same home with the minor child or has recurring access to the child, . . . over a period of time, not less than three months in duration, engage[d] in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense . . . ." "[S]ubstantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066" (§ 288.5, subd. (a)) "means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender" (§ 1203.066, subd. (b)).

For present purposes, based on the foregoing guidance from our high court, we assume, as a general matter, the alleged violations of former section 288a (now § 287) and section 289 would properly be characterized as lesser included offenses of section 288.5. However, we agree with the Attorney General that the factual allegations, specifically with regard to the time frame of the alleged offenses, preclude a determination that these were the "same offense[s]" within the meaning of section 1387.

Neither party has directed us to any case law directly on point on this issue, and our independent research has not revealed any. Nevertheless, based on the language of the statute, the legislative purposes as described by our high court, and additional case law, we conclude the allegations of continuous sexual abuse occurring in North Carolina in 1996 or 1997 were not the "same offense[s]" within the meaning of section 1387 as the subsequent allegations of violations of section 289 and former section 288a (now § 287) occurring in North Carolina in 2002.

The prosecution alleged in the felony complaint in case No. SCCR-CRF-2017-368 that the charged conduct occurred on or about "June to August 1996 and 1997." At the April 11, 2017, preliminary hearing, Deputy Cabron testified that L.M.D., who was born

24

in July 1988, told her that when she was 14, "she had gone to North Carolina to stay with [defendant] and Dawn and [defendant] had touched her inappropriately multiple times and asked her to suck his dick every day before he would go to work." Cabron testified that, in a follow-up interview, L.M.D. clarified the incidents in North Carolina occurred when she was nine or 10 years old, in 1996 or 1997. Hence, based on L.M.D.'s statements to law enforcement, the prosecution charged defendant with conduct occurring on or about "June to August 1996 and 1997." A subsequently filed information charged defendant in count 3 with a violation of section 288.5 occurring "[o]n or about June to August 1996 and 1997." This is the information that was dismissed in case No. SCCR-CRF-2017-368.

As the Attorney General notes, when the prosecution filed the accusatory instruments in case No. SCCR-CRF-2017-368, based on the evidence, it had no basis whatsoever to allege conduct by defendant against L.M.D. in North Carolina occurring in 2002. Rather, the prosecution charged the offenses as occurring in 1996 or 1997 based on the facts before it. This was no mere typographical error. At this point, the evidence only supported charging defendant with crimes occurring against L.M.D. in North Carolina in 1996 or 1997.

Defendant emphasizes Deputy Cabron testified at the preliminary hearing on April 11, 2017, that L.M.D. reported the incidents occurred when she was 14 and that she was born in 1988. However, Cabron also testified at that preliminary hearing that, in a follow-up interview, L.M.D. "clarified that it was when she was nine or ten years old," and she "stated it was in 1996 or 1997." Defendant asserts it was incumbent upon the prosecution to resolve this "obvious discrepancy." However, Cabron's testimony that L.M.D. subsequently clarified the incidents took place when she was nine or 10 and occurred in 1996 or 1997 did not give rise to a discrepancy. Rather, it seemingly *resolved* a discrepancy presented by Cabron's testimony that L.M.D., who was born in 1988, reported that the incidents occurred in 1996 or 1997 when she was 14.

25

Thus, when the accusatory instruments were filed in case No. SCCR-CRF-2017-368, the prosecution could not possibly have charged defendant with offenses against L.M.D. in North Carolina in 2002. When the true facts came to light and the prosecution charged defendant with similar *conduct*, it charged him with conduct alleged to have occurred *at a time* five to six years later. We conclude that these were not the "same offense[s]" within the meaning of section 1387.

The next dismissal, according to defendant, occurred in case No. SCCR-CRF-2017-795, when the trial court found probable cause lacking as to count 3 of the felony information, charging one violation of section 288.5. The court concluded: "Count 3 has not been adequately proven based on the time frame. The fact that there was no evidence that three or more months passed between the first and last acts . . . ."

However, again, at the time of this colloquy on July 7, 2017, and the trial court's resulting dismissal of count 3 charging defendant with violation of section 288.5, the felony complaint alleged that the conduct at issue occurred "[o]n or about June to August 1996 and 1997." The prosecutor did state: "I think Count 3 should be amended to say June to July 27th, or 26th -- to July 26th, 2002. And that would accurately reflect the testimony." However, on this record, the prosecutor did not actually *move* to amend count 3 and the trial court did not *rule* on any such motion. In his opening brief, defendant asserts that the prosecutor moved to amend to reflect the correct time period. However, while the prosecutor noted that count 3 should be amended, there is no oral or written motion in the record to amend the felony complaint, nor is there any court ruling on such a motion. Nor does the record support defendant's contention in his reply brief that "the record is clear that all the parties considered the complaint amended to reflect the new time frame." That the parties contemplated the legal sufficiency of the evidence concerning the new time frame in reference to the section 288.5 "not less than three months in duration" element does not establish the parties deemed the count amended to

26

reflect the 2002 time frame, or, more importantly, that the court granted a motion to amend.

Accordingly, with regard to what defendant asserts to be the second dismissal, the same analysis applies as did to the first dismissal:  these offenses were alleged to have occurred in 1996 and/or 1997, and were not the "same offense[s]" for purposes of section 1387 as those charged in subsequent charging instruments as occurring in 2002.  Every accusatory instrument filed *after* this point in time, including the operative third consolidated information, alleged defendant's offenses against L.M.D. committed in North Carolina occurred in 2002.

According to defendant, the third dismissal occurred when the trial court granted his motion which was to dismiss counts 7 through 16 of the information in case No. SCCR-CRF-2017-795 pursuant to section 995.  The court stated there was not "any basis of fact of the preliminary events that would be necessary to be established having taken place in Siskiyou County so that the North Carolina events could be charged based on the record from the preliminary hearing."  In other words, the court determined that there was no evidence in the preliminary hearing to satisfy the jurisdictional requirement of section 778a that defendant committed some act in Siskiyou County, in execution or part execution of the intent to commit a crime, which culminated in the commission of a crime in North Carolina.

The Attorney General, relying on *Casey v. Superior Court* (1989) 207 Cal.App.3d 837 (*Casey*), asserts a dismissal for lack of territorial jurisdiction is not the termination of an action within the meaning of section 1387, and that this was such a dismissal notwithstanding that it came about through defendant's section 995 motion.

In *Casey*, the petitioner asserted her prosecution was barred by section 1387 because of two prior dismissals.  (*Casey, supra*, 207 Cal.App.3d at p. 839.)  She contended "she was twice charged with the April 6, 1984, sale of methamphetamine and that on both occasions the San Joaquin County Municipal Court dismissed the charges 'in

27

the furtherance of justice,' i.e., pursuant to section 1385." (*Casey*, at p. 841.)

Notwithstanding the clerk's designation of the dismissal as one in the interest of justice pursuant to section 1385 (*Casey*, at pp. 840-841, 843, 845), one of the two prior dismissals was for lack of territorial jurisdiction (*id*. at p. 841). The Court of Appeal stated that the "essential issue presented is whether a dismissal of a complaint in one county for lack of jurisdiction because the crime charged occurred in another county is a dismissal within the parameters of section 1387." (*Casey*, at p. 839.) The court rejected the petitioner's contention that it was, concluding: "a dismissal for lack of jurisdiction is not a dismissal in the interest of justice within the meaning of section 1385." (*Casey*, at pp. 841-842.) The court stated, "we do not view a dismissal for lack of territorial jurisdiction as a dismissal in the furtherance of justice within the meaning of section 1385, notwithstanding the clerk's notation labelling it as such." (*Casey*, at p. 843.) The court noted: "A dismissal for lack of territorial jurisdiction is qualitatively different from those situations in which dismissals in the furtherance of justice have been approved. In the former situation, the court is not empowered to hear the case; in the latter it *chooses* to dismiss the case because other factors outweigh its authority to act." (*Id*. at p. 844.) Thus, the court concluded that the charges against the petitioner had "not been twice dismissed within the meaning of section 1387." (*Casey*, at p. 846.)

Defendant distinguishes *Casey*, asserting that this case does not involve a dismissal pursuant to section 1385, but rather a dismissal pursuant to section 995, which is among those statutes expressly invoked in section 1387.

As stated *ante*, section 1387, subdivision (a), provides, in part, that, with specified exceptions, "[a]n order terminating an action pursuant to this chapter, or Section 859b, 861, 871, or 995, is a bar to any other prosecution for the same offense if it is a felony . . . and the action has been previously terminated pursuant to this chapter, or Section 859b, 861, 871, or 995 . . . ." On its face, section 1387 counts section 995 motions among those that qualify as prior terminations for purposes of the two dismissal rule.

28

When defendant filed his motion pursuant to section 995, he was moving to set aside an information. Therefore subdivision (a)(2) of section 995 applied. Section 995, subdivision (a)(2), provides: "(a) Subject to subdivision (b) of Section 995a, the indictment or information shall be set aside by the court in which the defendant is arraigned, upon his or her motion, in either of the following cases: [¶] . . . [¶] (2) If it is an information: [¶] (A) That before the filing thereof the defendant had not been legally committed by a magistrate. [¶] (B) That the defendant had been committed without reasonable or probable cause." As the Attorney General notes, section 1004, subdivision (1), is the appropriate vehicle for a challenge to the information premised on a lack of jurisdiction. Unlike section 995, section 1004 is not one set forth in section 1387, subdivision (a), in reference to the two dismissal rule.

We are inclined to agree with the *Casey* court that a dismissal in substance for lack of jurisdiction is not a dismissal for purposes of section 1387. (*Casey, supra*, 207 Cal.App.3d at pp. 842-846.) Lack of jurisdiction is not a ground supporting a section 995 motion by its terms, and the section that does authorize a demurrer for such defect is not among the provisions section 1387 sets forth as constituting a prior termination of an action thus subject to the two dismissal rule.

In any event, even if we were to reach a contrary conclusion, the result would be the same. As discussed *ante*, the prior two dismissals on which defendant relies were not for the "same offense[s]" within the meaning of section 1387, but were for alleged offenses occurring years earlier. Accordingly, for purposes of section 1387 and the presently charged crimes, the dismissal denominated as one pursuant to section 995 was the first, and the two dismissal rule is therefore not implicated.

While "[n]o finding of malfeasance or additional investigation into the prosecutor's motivation in the specific case is required or warranted" (*Juarez, supra*, 62 Cal.4th at p. 1175), we further note that the policies underlying the enactment of section 1387 are not implicated here. Prosecutorial harassment was not implicated where

29

defendant was being prosecuted for sex offenses against minors, including L.M.D., whether or not the counts involving conduct against her in North Carolina were refiled. Forum shopping was not implicated in any manner. Finally, while defendant asserts, in a somewhat conclusory fashion, that the prosecution compromised his speedy trial rights, on this record, we are not persuaded. (See generally *Juarez*, at p. 1170; *Burris, supra*, 34 Cal.4th at p. 1018.)

The parties both address section 1387.1. Section 1387.1 "provides an exception to the 'two-dismissal rule': it permits the prosecution to file a violent felony charge a third time if either of the prior dismissals were due to 'excusable neglect,' and the prosecution did not act in 'bad faith.' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 255-256.) Subdivision (a) of that section provides: "Where an offense is a violent felony, as defined in Section 667.5 and the prosecution has had two prior dismissals, as defined in Section 1387, the people shall be permitted one additional opportunity to refile charges where either of the prior dismissals under Section 1387 were due solely to excusable neglect. In no case shall the additional refiling of charges provided under this section be permitted where the conduct of the prosecution amounted to bad faith." In light of our conclusion that the "same offense[s]" had been dismissed, at most, once prior to the filing of the currently charged offenses, we need not address the parties' arguments as to whether the prosecution was permitted to file charges a third time because prior dismissals were the result of excusable neglect within the meaning of section 1387.1.

II

*Evidence Code Section 1108 Propensity Evidence*

Defendant asserts that his convictions must be reversed because the trial court's admission of propensity evidence pursuant to Evidence Code section 1108—the evidence concerning A.M. and A.D.—deprived him of his due process right to a fair trial.

The Attorney General asserts defendant has forfeited his constitutional challenges to Evidence Code section 1108. Defendant replies that objection would have been futile.

30

(See generally *People v. Boyette* (2002) 29 Cal.4th 381, 432 [one exception to the general rule of forfeiture is that a defendant will be excused for failure to object or request an admonition if doing so would be futile].)  Assuming defendant's objection would have been futile in light of established case law discussed *post*, we address the merits of defendant's contentions.

Defendant asks us " 'to re-examine' the California Supreme Court's reasoning in *People v. Falsetta* (1991) 21 Cal.4th 903, 917 [(*Falsetta*)], where it held that admitting prior conduct evidence to prove a propensity to commit sex crimes under Evidence Code section 1108 does not violate due process."

In *Falsetta*, our high court was faced with a due process challenge to section 1108 on the ground that it allows for the admission of propensity evidence.  Our high court "conclude[d], consistent with prior state and federal case law, that section 1108 is constitutionally valid."  (*Falsetta, supra*, 21 Cal.4th at p. 907.)  We are bound by *Falsetta*.  (*Auto Equity Sales, Inc. et al. v .Superior Court* (1962) 57 Cal.2d 450.)  In any event, our high court has very recently declined an invitation similar to defendant's here.

In *People v. Baker* (2021) 10 Cal.5th 1044 (*Baker*), our high court stated:  "We held in [*Falsetta*] that 'the trial court's discretion to exclude propensity evidence under section 352 save[d] [Evidence Code] section 1108 from' a 'due process challenge.' [Citation.]  Defendant concedes as much, but asks us to 'revisit the issue,' observing that he must raise his objection now to preserve the issue for federal review.  We see no persuasive reason to revisit *Falsetta* and reject his claim on the merits."  (*Baker*, at pp.1089-1090, fn. omitted.)

Defendant also asserts that section 1108 violates his equal protection rights. However, he acknowledges several courts have rejected such a challenge.  (See *People v. Fitch* (1997) 55 Cal.App.4th 172, 184; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1394-1395.)  "Neither the federal nor the state constitution bars a legislature from distinguishing among criminal offenses in establishing rules for the admission of

31

evidence; nor does equal protection require that acts or things which are different in fact be treated in law as though they were the same." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1311 [equal protection challenge to Evid. Code, § 1109].) "The Legislature determined that the nature of sex offenses, both their seriousness and their secretive commission which results in trials that are primarily credibility contests, justified the admission of relevant evidence of a defendant's commission of other sex offenses. This reasoning provides a rational basis for the law." (*Fitch*, at p. 184.) Defendant's contention that a higher level of scrutiny should be applied is premised on his claim, rejected by our high court, that section 1108 violates due process, and therefore his contention is without merit. Section 1108 does not violate his right to equal protection of the law.

III

*Fines, Fees, and Assessments*

At sentencing, the trial court imposed a restitution fine (§ 1202.4, subd. (b)(2)) and a suspended parole revocation restitution fine (§ 1202.45) both in the amount of $10,000, a $70 AIDS education program fee (§ 264), cost of the presentence report in the amount of $420 (§ 1203.1b), a $40 court security fee for each conviction, totaling $1,040 (§ 1465.8, subd. (a)), a $30 criminal conviction assessment for each conviction, totaling $780 (Gov. Code, § 70373), and a $148 booking fee (Gov. Code, § 29550). The court inquired about an appointed counsel fee (§ 987.8), and, while counsel requested 100 hours, he further stated, when asked by the court, that defendant did not have the ability to pay, so the court did not impose that fee.

Relying on *Dueñas, supra*, 30 Cal.App.5th 1157, defendant asserts that the imposition of any fines, fees, or assessments without conducting a hearing to determine his ability to pay violates due process under the federal and California Constitutions, as well as the Eighth Amendment's protection against excessive fines. Defendant asserts we must stay all fines, fees, and assessments pending an ability to pay determination.

Defendant acknowledges his failure to raise the issue in the trial court, but asserts that we may nonetheless reach the issue.  Defendant also asserts that, if he forfeited his contention, he was deprived of the constitutionally effective assistance of counsel.

The Court of Appeal, Second Appellate District, Division Seven, filed *Dueñas* on January 8, 2019.  The trial court here sentenced defendant on May 30, 2019, almost five months later.  As defendant acknowledges, he did not raise *Dueñas*, due process, or the Eighth Amendment in relation to fines, fees, and assessments at sentencing.  Defendant's failure to raise these matters forfeits his arguments by operation of normal rules of appellate review.  (*People v. Scott* (1994) 9 Cal.4th 331, 351-354 (*Scott*) [to preserve a sentencing issue for appellate review, it must be raised in the trial court].)  This is so notwithstanding the fact that defendant's claims are constitutional in nature.  (See *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [constitutional exception to forfeiture rule did not apply to claim concerning failure to obtain express waiver of an ability to pay hearing]; *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881 [" ' "a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it" ' "]; see also *People v. Baker* (2018) 20 Cal.App.5th 711, 720 [Eighth Amendment claim of cruel/unusual punishment is fact-specific and is therefore forfeited if not raised in the trial court].)

Defendant makes other arguments seeking to avoid the forfeiture rule.  He argues: the trial court's failure to exercise its discretion requires reversal; the trial court's imposition of fines and fees without conducting an ability to pay analysis was unauthorized; and he may raise a contention concerning the deprivation of fundamental constitutional rights for the first time on appeal.  In light of our consideration of defendant's contentions in the context of defendant's ineffective assistance of counsel claim, and in light of our substantive determinations, we reject these contentions as moot and/or lacking in merit.

Thus, we proceed to defendant's ineffective assistance of counsel claim.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) To demonstrate prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)

The *Dueñas* court held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under []section 1465.8 and Government Code section 70373." (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.) That court also held that, "although []section 1202.4 bars consideration of a defendant's ability to pay [a restitution fine] unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.) Defendant asserts "[t]he same rationale applies to all fines, fees, and assessment[s]."

Defendant's arguments hinge on the analysis in *Dueñas* finding an ability to pay hearing is required before imposing fines and fees. We are not persuaded that this analysis is correct. We join the courts concluding *Dueñas* was wrongly decided and hold due process does not require determination of a defendant's present ability to pay before imposing the fines and fees at issue for the reasons set forth in those cases. (See *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320,

34

review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*); *People v. Caceres* (2019) 39 Cal.App.5th 917, 923-929.)  Our high court has granted review in *Hicks*, as well as in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, on the issue of whether a trial court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments, and if so, which party bears the burden of proof regarding defendant's inability to pay. We may still consider these cases as persuasive authority.  (Cal. Rules of Court, rule 8.1115(e)(1).)  We find the reasoning in *Hicks* and these other cases persuasive and reject the holding in *Dueñas*.  We thus conclude the imposition of fines, fees, and assessments on an indigent defendant does not violate due process and there is no due process requirement the trial court conduct an ability to pay hearing prior to imposing these fines, fees, and assessments.  In light of this determination, defendant's trial attorney's performance was not deficient for failure to raise the claim that due process required determination of a defendant's ability to pay before imposing fines, fees, and assessments.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 463 (*Ochoa*) [counsel is not constitutionally ineffective for failing to raise a meritless objection]; *People v. Price* (1991) 1 Cal.4th 324, 387 (*Price*) ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"].)  To the extent defendant raises it, we conclude his claim that his right to equal protection was violated by the imposition of fines, fees, and assessments without conducting an ability to pay determination lacks merit (*Aviles,* at pp. 1068-1069), and therefore defense counsel was not ineffective for failing to raise it (*Ochoa*, at p. 463; *Price*, at p. 387).

Nor has defendant persuaded us that imposition of the fines, fees, and assessments violated his Eighth Amendment right against excessive fines as that right was recently described by the United States Supreme Court in *Timbs v. Indiana* (2019) __ U.S. __ [203 L.Ed.2d 11], on which defendant relies.  Defendant has cited us to no authority, nor

have we discovered any on our own, to establish the fines, fees, and assessments imposed in this case are excessive based on " '(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay.' " (*Aviles, supra*, 39 Cal.App.5th at p. 1070, quoting *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728; see *United States v. Bajakajian* (1998) 524 U.S. 321, 334 [141 L.Ed.2d 314].) Thus, counsel was not constitutionally ineffective for failing to raise defendant's Eighth Amendment claim in the trial court. (*Ochoa, supra*, 19 Cal.4th at p. 463; *Price, supra*, 1 Cal.4th at p. 387.)

In connection with his argument concerning fines, fees, and assessments, defendant in his reply brief requests that we take judicial notice of statements on the California Department of Corrections and Rehabilitation website. We deny defendant's request for judicial notice " 'because the proffered material is unnecessary to our decision.' " (*City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 594, fn. 13.)

### DISPOSITION

The judgment is affirmed.

            _____

             HULL, J.

We concur:

_____

RAYE, P. J.

HOCH, J.